Good morning, everyone. Good morning, Judge Rovner. Good morning. Good morning. Our first case up for oral argument this morning is Hossfeld v. Allstate Insurance Company, number 25-1518, consolidated with 25-1672. Mr. Tice, good morning. Good morning, and may it please the Court. This case asks whether Allstate can be held liable as a matter of law on summary judgment for the TCPA violations of its agents' agents' agent, a telemarketing vendor called Atlantic Telecom, which marketed multiple insurance companies' products and which Allstate had no relationship with. The answer under basic agency principles is no. All agree that a minimum sub-agency requires some manifestation of assent from Allstate that the alleged appointing agent called Transfer Kings could appoint the alleged sub-agent, Atlantic, but the sole Mr. Tice, I'm sorry to interrupt, but regarding agency, the restatement states that a principal intent of the appointment of sub-agents may be expressed or implied, and that sub-agents may be appointed in series. Given the structure that was set up by Allstate in which the use of non-contracted vendors was so expected as to be expressly approved and regulated, why doesn't that recognition of the need for sub-agents to carry out the work at least imply consent for the appointment of sub-agents in series? And what in that structure or language indicates that Allstate expected the use of non-contracted vendors to be limited to the first level? Thank you, Your Honor. A few responses to that. I think first of all, I think the key point is that an agency relationship is a fiduciary personal relationship between a principal and an agent, and therefore delegating an agent's authority to others is not normally implied unless you have some sort of manifestation of assent. Here, there was manifestation of assent for the direct agents, the Fleming and Gilmond, to appoint others as at least independent contractors. There was a dispute below about whether they were actual agents who could bind Allstate or merely independent contractors. But I agree with you, Your Honor, if Transfer Kings had made the calls here, we would be in a different situation. We would be in a normal agency situation where the only question was whether Transfer Kings was operating as a sub-agent of Allstate. Here, we don't need to get into that complicated factual question, though, Your Honor, because this was an agency that was appointed in series based on language in the contract that did not say anything about multiple different levels of sub-agency. And I think that would really kind of open a Pandora's box where you could have unlimited liability long down an agency chain. There's no reason why the liability would have to stop at Atlantic. Any one Atlantic appointed could bind Allstate under the district. Where anywhere in this record does it state that you do not forbid the agent from fulfilling its marketing campaign by using non-contracted vendors that themselves use other vendors for the job? There's nothing that prohibits the use of non-contracted vendors. Again, Your Honor, the question, though, is the non-contracted vendor we're speaking about here is Atlantic. It's someone that Allstate had no interaction with. Allstate had no contractual relationship with. It did not even have any relationship or even knowledge of the appointing agent. Look, to allow Allstate, it seems to me at this point, although of course I await your response, to accept liability by simply using a straw man vendor in between the agent and the actual defendant. No, Your Honor. Plaintiff could have sued the actual people who were making the phone calls. It could have sued the agent who appointed the person who made the phone calls. It even, under a sub-agency theory, could have sued Fleming and Gilmond for instructing, allegedly, its agents and sub-agents to call. What's happening here is that they are trying to go after the most deep-pocketed defendant in a situation where there's no connection between that agent and the alleged sub-sub-agent. Now, you asked earlier about how agents may be appointed in series. And I agree with you, Your Honor. That is reflected in the restatement. But here's exactly what that passage in the restatement says. This is in Comment C in Restatement Section 3.15. And it says, quote, sub-agents may be appointed in series. And here's the key. This would occur when a sub-agent has actual or apparent authority to appoint another for whose conduct the appointing sub-agent is responsible. For whose conduct the appointing sub-agent is responsible. So the key there, Your Honor, I think, is that, yes, you can appoint sub-agents in series. But in that situation, the appointing sub-agent becomes the new principal. It doesn't mean that it then flows all the way up to the original principal because otherwise you have an unlimited liability situation. Well, I am having a problem because it seems to me that all states have set up a structure so that the agent can accomplish the marketing as it sees fit and can use other vendors to accomplish it without input or approval from all states. So, you know, it certainly, it wouldn't be unexpected for all states to have no knowledge of the particular vendor. It seems to me that the use of multiple vendors is an expected part of the structure that was used by all states for its telemarketing and that such contractors in that structure, such as Atlantic, could properly be considered a subject of all states. Well, I think that's a key point, Your Honor. I think that you mentioned earlier implied authority to appoint sub-agents or for sub-agents to appoint sub-sub-agents, et cetera, that is a recognized form of creation of sub-agency. The problem is there's zero record that this was business or custom in the industry. I could imagine on a different record if plaintiff had come forward with evidence to say, in these circumstances, everyone knows that sub-agents appoint sub-sub-agents who appoint sub-sub-sub-agents, et cetera, et cetera. In that circumstance, you might have a record by which the district court could say, yes, this is implied authority to appoint those agents. The problem here is you don't have that. We pointed out that there was zero evidence of that in the record. Appellant, I'm sorry, appellee does not dispute that. And in fact, the district court pointed only to a lack of evidence denying such custom evidence, which of course shifts the summary judgment burden to us. It was plaintiff's burden to show an agency relationship, not ours to deny that there might be business or custom evidence available. So I think for all those reasons, this is ultimately a straightforward case based on what the district court actually resolved, which is did this particular alleged sub-sub-agent, was it validly appointed? And if the answer is no, it was not validly appointed, then again, the appointing agent might be held responsible, but that doesn't go up the liability chain all the way to all state. Otherwise, again, as my friend on the other side does not deny, you would have unlimited liability for every person that is appointed in series ad infinitum, which can't be the right result. I'm happy to address some of the other issues, apparent authority or ratification. Mr. Tice, before you do that, the district court decided this based on actual authority. Correct. And you have argued that Hossfeld waived the apparent authority and ratification arguments. No, Your Honor. And I understood your briefing. And I'm not sure how he could waive them given the district court didn't rule on that. Your Honor, we don't think he waived those arguments. And if I wrote something that implied that, I apologize. There was really two arguments, ratification and apparent authority, definitely preserved. Those are valid arguments for alternative grounds for affirmance. They're now fully briefed. Both sides have asked you to resolve those. So I think that's fine. It was a third issue that had to do with, I couldn't, I might've misunderstood exactly what the argument was, but it sounded like direct agency authority between all states. Yes, I understand that's different. Right. That one is one that the district court didn't address because we don't think the other side raised it below. Either way. And if we agree with you on the actual authority argument, can we decide the apparent authority and ratification issues? Or does that need to go back to the district court? I don't think it needs to go back for the reasons set forth in our brief. And again, I think both sides have asked you to reach it. It's fully briefed. We think it can be resolved as a matter of law on this record, um, in our favor, just because again, apparent authority, I think the key is that there still needs to be a manifestation of assent from all state that leads the third party here, Hossfeld, or at least the general public to believe that these, uh, eight, these sub sub sub agents were acting on our behalf and subject to our control. Um, there's, they don't point to any all state manifestation in this record. So I think that takes care of apparent authority for ratification. It just seems a big stretch to say we somehow ratified the very behavior we were being sued over. We weren't affirming that conduct. We were denying it. You know, they were added to a disapproved vendor list months after this lawsuit was filed. We never ratified their conduct. We didn't, we didn't invite it. So, and there's no evidence that Mr. Hossfeld actually purchased all state insurance. Is that correct? Correct. And no issue of fact on that at all? That's correct. That's, that is, uh, undisputed in the record. I can find the, find the site when I, that's okay. That's all right. Oh yes. No, no, no purchase of insurance either. And I think if you resolve those three issues, that ends this case, you don't need to get into the willfulness or knowing this, and you don't need to reach the cross appeal either because that, um, depends on a valid non-summary judgment claim against them. What specific definition of a willful or knowing conduct do you propose that we adopt? Your Honor, if you reach that issue, we think the, uh, the 11th circuits articulation is the correct one, which is that the, uh, the entity needs to be aware of the facts which give rise to liability. Um, so, uh, it doesn't mean they have to understand, they don't need to be a lawyer and understand whether it's illegal or not, but they do need to know or act willfully regarding the key liability creating facts. So I think in this situation, if you look at SA 36, special appendix 36, that's the judgment we were found liable for violating, uh, 47 CFR 64.1200 D3. Um, and that has to do with, uh, folks initiating a call to a residential subscriber who's on a do not call list. So I think in that situation, the facts that the defendant would need to know are, was a call initiated for telemarketing purposes to a residential telephone subscriber who with knowledge that the number was on a do not call list. Is it your argument that recklessness should not be considered, that it has to be actual knowledge because in the Fair Credit Reporting Act cases and other cases, we've made clear that recklessness satisfies that? Yes. I mean, I'm using the, the statutory language willful or knowing. I think given willful or, you know, given that language, it sounds to me like recklessness maybe, uh, you know, should, is, is sort of a stretch, but I acknowledge that some cases, including I think some of the cases we cite do acknowledge that reckless disregard can be, uh, you know, satisfy willfulness. So, um, I think at the end of the day though, it's clear that the district court didn't apply this analysis. It just said anything intentional is sufficient. Uh, so if you intentionally made a phone call, that's the end of it. You don't actually have to intentionally look at those things. So at a bare minimum, I think that would create a factual question that would have to go back. Uh, granted, given that the district court granted summary judgment against us or granted summary judgment to, to my friend on the other side. Um, you are into your rebuttal time. If you want to say anything, I would like to thank you very much, Your Honor. Mr. Burke.  May it please the court. This cast case asks whether a company can implement a telemarketing system whereby it authorizes agent telemarketing and generalized use of external providers, delegates internal do not call compliance responsibility to its agents, imposes policies and practices that predictably and systematically produce calls to internal do not call numbers, fails to utilize internal do not call compliance audit tools that it built into the system and accepts the benefits of the system and then disclaim responsibility when the system it created produces calls to phone numbers that are on the internal do not call list. You seem to be describing a claim for direct liability rather than vicarious liability. No. This was not litigated on a direct liability for negligent supervision or something, you know, a theory like that. So if you could kind of stick to the key question here, which is under the principles of agency, whether all state, um, exhibited either expressly or impliedly a manifestation of assent for its insurance agents to hire subagents who could then themselves hire subagents. So the manifestation of assent to hire sub, subagents is I think what's in dispute here. What's your best evidence for that manifestation of assent for the sub, the creation of a sub, sub agency relationship? Thank you, Your Honor. Given the common law rule against the delegation of that authority. I understand, Your Honor. Now, I wasn't intending to argue direct liability. Well, I was a little, it wasn't quite clear in your brief because there were strains of your suggested that you were shifting to something of a direct liability theory on appeal. I mean, I think there could be direct liability, but we did not raise it in our brief. I think the regulation itself says you can have direct liability. And I think that all state could have direct liability. I'm not inviting this theory. I'm just clarifying. Understood, Your Honor. The best evidence of authorization to engage sub, sub vendors is at the top of A48, the first sentence, where it says agencies should ensure that an external provider offering services through these channels complies with all these corporate policies and applicable state and federal laws and regulations. That's the sub agency layer or level. This case concerns a sub, sub agency. Your Honor, I think that I read this provision as being extremely broad. All state didn't say that, you know, agencies should ensure that providers they hire offering services through these channels. Instead, all state elected to use broader language that did not so limit the authority to engage vendors or for those vendors to engage sub vendors. At a minimum, this provision at the top of A48 evinces It reads like a limitation on the insurance agent's authority. Not permission for the insurance agent to contract with sub agents and then sub, sub agents in a permissive way that would violate all state's policy. Respectfully, Your Honor, I disagree. It doesn't say the external providers that you hire. It's not limited in the way, my reading of this provision is not limited in the way that Your Honor is suggesting. Again, it doesn't say that they could only engage one level of providers. They, all state drafted this to say that there's authority to use external providers. And what are the limits of your argument? Could Atlantic then hire a sub agent who could hire a sub agent and all state would continue to be liable several times removed? Your Honor, the answer resides in this authority. So, well, I'm asking what is your answer based on your reading of that authority? How far out they could continue to be liable 10 layers out? I think that that is correct. And that arises from the system that all state created. Do you agree that there's no evidence that all state even knew about Atlantic here? Well, at the time of the calls? No. At the time of the last call that plaintiff received that arose from the Gilmont contract, that last call was post-filing. And before then, do you agree that there's no evidence that all state knew that Transfer Kings had hired Atlantic to make these calls? I didn't see any. I agree. Do you also agree that there's no evidence that all state at that time knew about Transfer Kings being hired? It wasn't until later. I believe there was a prior consumer complaint arising from Transfer Kings calls. We didn't brief this. I did not see anything in the record before the district court, and please correct me if I'm wrong, that would support that all state knew anything about Transfer Kings being hired and then they hired sub-agents. Do you agree with that as to Transfer Kings? Your Honor, I can't remember if this is in the record or not. Okay. Well, would it be dispositive that all state had no knowledge of Atlantic? If Atlantic set up its structure so that the agent can accomplish the marketing as it sees fit and can use other vendors to accomplish it without any input or approval from all state? I think, Your Honor, the approval from all state arises from the top of A48, and frankly, the reasons that Your Honor raised in your first question to appellant. All state created this system. It allowed engagement of external providers. Well, it allowed external providers to engage in telemarketing on its behalf, and I think all state claims it's a victim here, but I think that if it's a victim, it's a victim of its own policies. Mr. Burke, is there any evidence in the record that all state retained any benefit from Atlantic's calls to your client? Yes. All state issued a quote for insurance. I believe two quotes for insurance arise. Now, at least one quote for insurance arising from a Gilman call to Hossfeld. But what was the benefit that all state got? I mean, the benefit is a marketing benefit. He never purchased. Is that correct? That is correct. But I think that there are tangible benefits to marketing. The reason to market, to use telemarketing is to reach out to consumers, and marketing costs money and has an objective. It's to try to induce consumers to purchase your products and services. Had there been no marketing, there would be no benefit. But the marketing itself is the benefit. Your Honor, I'd like to talk to you about damages for a minute. Yes. Thank you. Regarding damages, if we determine that demonstrating willful violation of the Act requires something more than a volitional act, such as at least reckless disregard, can that standard be met on this record or would a remand be necessary? I mean, absolutely. I think that the district judge should be affirmed. I think that knowing a violation arises from one of three things. Deliberately maintain compliance architecture that allowed the violations, which I believe we have here. The violations were ratified by the defendant or the caller, which we have here. Or the company failed to engage in reasonable auditing of the system it created. I think that the differentiation between knowing and willful is that a willful violation would be where the defendant knew of facts that suggested that its policies and practices were not effective in preventing violations but failed to remedy that issue. And I think that a not willful violation would be where the defendant had lawful policies, actual coordination, reasonable auditing, engaged robust vendor controls, and the violation was an isolated, unauthorized breakdown. I'd like to take a moment to address the class certification cross-appeal. The district court abused its discretion in denying class certification on numerosity grounds where plaintiff identified two aspects of all states nationwide internal do not call policies and practices that allowed telemarketing to telephone numbers that were or should have been on all states internal do not call list. As a proof of concept, plaintiff showed 33 instances where these policies and practices caused violations, including to the plaintiff. The 33 identified consumers were the floor, not the ceiling. Mr. Burke, we've said that this isn't just a numbers game. And Rule 23 specifically makes clear that the question is whether or not joined or was practical below. And you didn't even make that argument. So how could you prevail on numerosity? Your argument is essentially we've got 33 and there are probably more. I think that that's, respectfully, Your Honor, I think that's overly simplistic. We identified two- You did not argue anywhere that joined or wasn't practical under the other federal rules, which is what the numerosity element of class certification requires. I believe we showed that joined or is impractical by identifying two nationwide policies that predictably created internal do not call violations. But you didn't argue it. So you're saying that the court should just figure that out on its own? Your Honor- The rule's pretty clear. And our case law has been clear on that. Absolutely. And I was- If the standard is 40 or more class members, that creates an inference that joined or is impracticable. And we've demonstrated 33 and also showed a nationwide policy and practice, two nationwide policy and practices that systematically and predictably created internal do not call violations. I think that there is a reasonable inference that there are at least 40, but really many more violations here. So that's my answer. You know, you have not directed the court to any evidence of how many all state agents use third party services similar to Transfer Kings or, I believe, how many, if any, calls such third parties made to numbers on all states do not call a list. I mean, the district court didn't require specificity, but she needed more than conclusory allegations that joined or is impractical. Or specification as the size of the class to prove numerosity. I understand that, Your Honor. But in the face of these two nationwide policies and practices that systematically, and particularly the consent exception that has no basis in the TCPA, I think that there's a reasonable inference that there are at least 47 more than we demonstrated, but in fact, many thousands more. All state have put in the record that there were 6,000 agents. The authorization to engage third party vendors is prominent in the agency standards and in the internal do not call policy. I think that, you know, I think that this demonstrates a reasonable inference that there were, again, at least 40, but many more. Thank you, Mr. Burke. Mr. Tice, you have just a little bit of time left. Thank you. I'm happy to address any questions you have. Otherwise, I'll just try to make three quick points. The first is on the record sites. A-127 is the site for the fact that hospital purchased no insurance. And A-116 is the page that says that all state was unaware Atlantic existed until after this lawsuit was filed. That's our statement of fact. The response is admitted. The same for Transfer Kings on the page before, so there should be no dispute about that. The second quick point I'll make is that this case, there's been a lot of argument from my friend on the other side about the policies, the overall policies, but ultimately this case is about 12 specific phone calls that all state was held liable for. The way this case has been litigated all along, the way it's been litigated in other cases is under this agency theory and a question of whether or not the liability chain extends that far down. You could imagine a different case where the calls had been made by our agent or our sub agent, or it could have been a different record showing business and custom evidence. So this is not a case where all state is trying to avoid liability for its actions. It's a question of whether it can be held liable on unending chain of liability for entities that might be acting without its knowledge or control. And in fact, all state doesn't even know they exist. Finally, on the benefit point, Your Honor, you asked a couple of questions about whether any benefits were received. I want to point out that if you look at pages 15 and 16 of our reply brief, the calls in which quotes were made were made actually after the second amended complaint had been filed. So there's no allegation that there was any benefit whatsoever received from these particular 12 calls on which we were held liable. Given that there's an unlimited liability chain here, we ask this court to please reverse. Thank you very much. Thank you, Mr. Tice. Thanks to both sides. The court will take the case under advice.